**VISION MINING, INC., Appellant,**

v.

**Jesse GARDNER, et al., Appellees.**

**and**

**Peabody Coal Company, Appellant,**

v.

**Joe Martinez, et al., Appellees.**

Nos. 2010–SC–000311–WC,
2010–SC–000438–WC.

Supreme Court of Kentucky.

Rehearing Denied May 24, 2012.

Dec. 22, 2011.

Anthony Kenneth Finaldi, John Edward Ballerstedt, Jr., Ferreri & Fogle, PLLC, Louisville, KY, Counsel for Appellant, Vision Mining, Inc.

Peter J. Glauber, Boehl, Stopher, & Graves, LLP, Louisville, KY, Counsel for Appellant, Peabody Coal Company.

Thomas E. Springer, III, Springer Law Firm, PLLC, Madisonville, KY, Counsel for Appellees, Jesse Gardner and Joe Martinez.

Douglass Wayne Gott, Pushin Building, Bowling Green, KY, Counsel for Appellee, Hon. Douglas W. Gott, Administrative Law Judge.

Russell Scott Borders, Florence, KY, Counsel for Appellee, Hon. R. Scott Borders, Administrative Law Judge.

Dwight Taylor Lovan, Executive Director, Office of Workers' Claims, Frankfort, KY, Counsel for Appellees, Workers' Compensation Board and Dwight Taylor Lovan, Commissioner, Department of Worker's Claims.

Jack Conway, Attorney General, Frankfort, KY, Counsel for Appellee, Hon. Jack Conway, Attorney General of the Commonwealth of Kentucky.

Christopher H. Smith, Kentucky Labor Department, Frankfort, KY, Counsel for Appellee, Christopher J. Smith, Executive Director, Office of Workplace Standards, Kentucky Labor Department.

Peter J. Naake, Louisville, KY, Counsel for Amicus Curiae, United Mine Workers of America, Kentucky Chapter of American Federation of Labor and Congress of

Industrial Organizations (AFL–CIO), Appalachian Citizens' Law Center, and Kentucky Workers' Association.

Opinion of the Court by Justice SCOTT.

Notwithstanding their 37 and 34 years' work in underground coal mines, the Workers' Compensation Board affirmed decisions to dismiss both Appellants' applications for benefits because the "consensus readings" of their X-rays interpreted them to be negative for coal workers' pneumoconiosis (black lung).[1] On review, however, two separate Court of Appeals' panels held the "consensus procedure" required by KRS 342.316 for proving the existence of coal workers' pneumoconiosis and the "clear and convincing" standard the statute requires to rebut such a consensus unconstitutional.

In so doing, both panels of the Court of Appeals determined that such provisions denied the claimants and other workers who suffer from coal workers' pneumoconiosis equal protection under the law by placing a more stringent burden of proof on them than those who suffer from pneumoconiosis from other sources. Having heard these two cases together and having extensively reviewed their records and histories, we agree with the conclusions of the Court of Appeals.

## I. PNEUMOCONIOSIS AND WORKERS' COMPENSATION

These appeals involve an equal protection challenge to KRS 342.316, which de-

fines the evidentiary procedure and standard for coal workers' pneumoconiosis claims. As a result, before delving into their background, we believe it prudent to address the distinctions, if any, between coal workers' pneumoconiosis (contracted from coal dust) and pneumoconiosis contracted from other dusty particulates, as well as to outline the differing statutory treatment of coal workers' pneumoconiosis versus other pneumoconiosis.

### A. Pneumoconiosis

Although the disease is given different names depending upon the source of the dust, there is no "natural" or "real" medical distinction between coal workers' pneumoconiosis and other occupational pneumoconiosis:

"Pneumoconiosis" is simply a generic term for a lung disease evidenced by pigmentation and fibroid induration. The disease is traceable to not only coal dust, but other types of dust particles as well. Some of these include: aluminum (aluminosis), asbestos (asbestosis), cotton dust (byssinosis), iron (siderosis), sandstone (silicosis), tobacco (tabacosis), and ostrich feathers (ptilosis). The fact that these many other environmental sources of particles also cause pneumoconiosis is the proverbial fly in the ointment for this legislative scheme. *There is no medical evidence whatever that any characteristic of disease, itself, sup-*

1. Under the federal "black lung" act, 30 U.S.C.A. § 801 et seq., a negative chest X-ray, by itself, is insufficient to overcome a statutory presumption that a coal miner, who died before 1978 and had worked in the coal mines for 25 years before 1971, died of pneumoconiosis. 30 U.S.C.A. § 921(c)(5); *see also* 20 C.F.R. § 727.204(d) (1980) (now 20 C.F.R. § 718.306(d)(3)); *Battaglia v. Peabody Coal Co.*, 690 F.2d 106, 111 (7th Cir.1982) (In its enactment of the federal black lung act, "Congress had before it evidence that the

length of coal mine employment, i.e., the length of exposure to coal dust, was directly related to the incidence of pneumoconiosis."). In fact, 30 U.S.C.A. § 921(c)(2–5) employs four "work period" presumptions relating to coal workers' pneumoconiosis—two ten year, one fifteen year, and one twenty-five year presumption. However, under the existing "consensus procedure" mandated by KRS 342.316, a lengthy work history in dusty coal mines is generally irrelevant versus a "consensus."

ports a "natural" or "real" distinction in the class of workers who contract it, based on whether the employee was a coal miner or custodian of the ostrich cage at the Louisville Zoo.

Kentucky Harlan Coal Co. v. Holmes, 872 S.W.2d 446, 458 (Ky.1994) (Stephens, C.J., dissenting). Simply put, "pneumoconiosis is pneumoconiosis is pneumoconiosis." Id. at 456 (quotation marks omitted); see also STEDMAN'S MEDICAL DICTIONARY 1522 (28th ed.2006) (describing pneumoconiosis as "[i]nflamation commonly leading to fibrosis of the lungs caused by the inhalation of dust incident to various occupations. . . .").

## B. Statutory Treatment

Despite the fact that there is no real distinction between the various forms of pneumoconiosis, Chapter 342 of the Kentucky Revised Statutes treats coal workers differently than those from other occupations with respect to workers' compensation.[2] Specifically, these varying claimants endure different procedures and presumptions and enjoy distinct benefits.

### 1. Procedure and Presumptions

For coal workers' pneumoconiosis, KRS 342.316(3) requires a different procedure to establish its existence than it requires for all other types of pneumoconiosis. In addition, KRS 342.316(13) requires "clear and convincing" evidence to rebut a panel consensus for coal workers' pneumoconiosis claims, while KRS 342.315(2)—addressing other occupational pneumoconiosis and diseases—requires only "a reasonable basis" to rebut a university evaluator's clinical findings and opinions, i.e. a standard lower than "clear and convincing." Magic Coal Co. v. Fox, 19 S.W.3d 88, 95 (Ky. 2000).

### a. The Procedure for Coal Miners

In the first instance, KRS 342.316(3) requires a two-step "consensus" procedure for evaluating X-ray evidence of coal workers' pneumoconiosis. Hunter Excavating v. Bartrum, 168 S.W.3d 381, 382 (2005). Pursuant to this statute, a claimant must submit an X-ray, along with an interpretation of that X-ray. KRS 342.316(3)(b)1. The employer may then submit its own X-ray and interpretation. KRS 342.316(3)(b)4.d. If the two interpretations do not agree, the highest quality X-ray is sent to a panel consisting of three individual "B" readers,[3] chosen at random, who issue their own interpretation. KRS 342.316(3)(b)4.e. If a consensus is not reached by the panel,[4,5]

2. An occupational disease results from injurious exposure due to the nature of the worker's employment such that the employment is the proximate cause of the disease. KRS 342.0011(2) and (3). Chapter 342 considers exposure to an occupational hazard to be injurious if it is sufficient to cause a disease independently of any other cause. KRS 342.0011(4). As a result, pneumoconiosis constitutes an occupational disease when caused by a sufficient work-related exposure to dust.

3. KRS 342.794(3) defines the term "B" reader.

"'B' reader" means a physician who has demonstrated proficiency in evaluating chest roentgenograms for roentgenographic quality and in the use of the ILO classification for interpreting chest roentgenograms

for pneumoconiosis and other diseases by taking and passing a specially designed proficiency examination given on behalf of the National Institute of Occupational Safety and Health (NIOSH) or by the Appalachian Laboratory for Occupational Safety and Health (ALOSH), or their successors. KRS 342.794(1) provides for a list of qualified "B" readers who interpret chest X-rays when the parties' reports are not in consensus. Bartrum, 168 S.W.3d at 384–385.

4. KRS 342.316(3)(b)4.f. sets forth the definition of consensus for purposes of establishing a coal workers' pneumoconiosis claim:

"Consensus" is reached between two (2) chest X-ray interpreters when their classifications meet one (1) of the following criteria: each finds either category A, B, or C

the ALJ renders a decision based on the evidence submitted. *Id.* If, however, as is often the case, there is a consensus,[6] copies of the report are considered as evidence. *Id.* For all practical purposes, this consensus is the *only* evidence controlling the result.

To encourage a consensus among the three randomly selected "B" readers, KRS 342.794(4) provides that the "readers" are evaluated not only with respect to the timeliness and completeness of their reports, but also as to "the frequency at which the physician's classification of X-rays differs from the consensus reading." In fact, the statute compels removal of a physician "from the 'B' reader list … if the physician's interpretations of X-rays are *not* in conformity with the consensus reading fifty percent (50%) of the time." *Id.* (emphasis added).

Secondly, once a consensus is reached by at least two of the three chest X-ray interpreters, it is presumptively correct "unless overcome by clear and convincing evidence." KRS 342.316(13). In *Fitch v. Burns,* 782 S.W.2d 618, 622 (Ky.1989), this Court concluded that "this approach requires the party with the burden of proof to produce evidence substantially more persuasive than a preponderance of evidence, but not beyond a reasonable doubt." However, beyond establishing the boundaries (somewhere between preponderance of evidence and beyond a reasonable doubt), the Court asserted that it could provide no definition or guideline as to how a court should apply. this evidentiary standard:

We conclude that where the "burden of persuasion" requires proof by clear and convincing evidence, the concept relates more than anything else to an attitude or approach to weighing the evidence, rather than to a legal formula that can be precisely defined in words. Like "proof beyond a reasonable doubt," *"proof by clear and convincing evidence" is incapable of a definition any more detailed or precise than the words involved.*

*Id.* (emphasis added). Yet, in other instances, we have defined the standard as "proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *See, e.g., Commonwealth Cabinet for Health and Family Services v. T.N.H.,* 302 S.W.3d 658, 663 (Ky.2010) (citation omitted); *see also* BLACK'S LAW DICTIONARY 636 (9th ed.2009) (defining "clear and convincing evidence" as "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.").

In the context of coal workers' pneumoconiosis claims, the decision of the ALJ in the Gardner claim demonstrates that additional X-ray evidence, testimonial evidence as to increasing difficulty breathing, and over 37 years' work in underground mining, *did not* constitute "clear and convincing evidence" sufficient to rebut the consensus reached by two chest X-ray interpreters. *See infra* Section II.A. Thus, as indicated, overcoming the presumption

---

progressive massive fibrosis; or findings with regard to simple pneumoconiosis are both in the same major category and within one (1) minor category (ILO category twelve (12) point scale) of each other.

5. Parties commonly refer to the three randomly-selected "B" readers who consider the

X-rays in a given claim as a consensus panel. *Bartrum,* 168 S.W.3d at 385.

6. According to the Commissioner's July 1, 2003 report to the Interim Joint Committee on Labor and Industry, 98% of panels reach a consensus.

created by a "B" reader consensus is practically impossible.[7,8]

### b. The Procedure for Other Pneumoconiosis Claimants

In contrast to coal workers' pneumoconiosis, KRS 342.316(3)(b)4.b. and KRS 342.315(1) require workers suffering from non-coal-related pneumoconiosis to only undergo a university evaluation rather than a consensus process. In this regard, KRS 342.316(3)(b)4.b. provides that "[t]he commissioner shall assign the claim to an administrative law judge and, *except for coal workers' pneumoconiosis claims*, shall promptly refer the employee to such physician or medical facility as the commissioner may select for examination." (Emphasis added). And, KRS 342.315(1) states that "[t]he commissioner shall contract with the University of Kentucky and the University of Louisville medical schools to evaluate workers who have had injuries or become affected by occupational diseases covered by this chapter."[9] Thus, it is fair to say in these non-coal cases, it is the total evaluation which is important, not just an X-ray interpretation.

Moreover, workers suffering from non-coal-related pneumoconiosis are not required to produce "clear and convincing evidence" to rebut these evaluations. Upon sufficient grounds, the ALJ may disregard them. KRS 342.315(2) states that "the clinical findings and opinions of the [university] evaluator [are] afforded presumptive weight by administrative law judges and the burden to overcome such findings and opinions ... fall[s] on the opponent of that evidence." In *Fox*, 19 S.W.3d at 95, this Court rejected the Workers' Compensation Board's determination that this presumption could only be overcome by "clear and convincing evidence." Based upon KRE 301, the Court instead recognized the discretion afforded an ALJ with respect to non-coal-related pneumoconiosis and held that that KRS 342.315(2) only calls for a reasonable basis to rebut a university evaluator's clinical findings and opinions:

7. Our conclusion that it is thus practically impossible to overcome the presumption created by a "B" reader consensus also finds support in the background underlying our decision in *Cain v. Lodestar Energy, Inc.*, 302 S.W.3d 39 (2009). In *Cain*, the claimant could not successfully rebut the consensus of 0/0 despite the fact his employer conceded in its response to his claim that he suffered from category 1/1 disease. *Id.* at 41, 43.

8. Given that the task is one of successfully rebutting at least two prior consensus "experts," we can only conceive of one scenario in which a coal worker can successfully rebut the presumption arising from the "consensus" with another expert opinion: an autopsy by a pathologist, which should scientifically resolve whether he or she suffered from pneumoconiosis and to what degree. *See* GOVERNOR'S INDEPENDENT INVESTIGATION PANEL, UPPER BIG BRANCH—THE APRIL 5, 2010, EXPLOSION: A FAILURE OF BASIC COAL MINE SAFETY PRACTICES (2011) (Of the 24 coal miner victims of the Upper Big Branch explosion with sufficient tissue for autopsy examination, 17 had coal

workers' pneumoconiosis.); *see also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 32, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ("[T]he findings of the Surgeon General and others indicated that although X-ray evidence was generally the most important diagnostic tool in identifying the presence or absence of pneumoconiosis, *when considered alone it was not a wholly reliable indicator of the [a]bsence of the disease; that autopsy frequently disclosed pneumoconiosis where X-ray evidence had disclosed none;* and that pneumoconiosis may be masked from X-ray detection by other disease.") (emphasis added) (footnotes omitted). With this in mind, the unfairness of such an evidentiary threshold against a "negative" reading speaks for itself.

9. These workers may, in some circumstances, be sent to a private physician, assuming that doctor is sufficiently affiliated with a university. *See Morrison v. Home Depot*, 279 S.W.3d 172 (Ky.App.2009) (holding that a doctor was sufficiently affiliated with medical school to be considered a university evaluator).

KRS 342.315(2) creates a rebuttable presumption which is governed by KRE 301 and, therefore, does not shift the burden of persuasion. Pursuant to KRS 342.315(2), the clinical findings and opinions of the university evaluator constitute substantial evidence of the worker's medical condition which may not be disregarded by the fact-finder unless it is rebutted. Where the clinical findings and opinions of the university evaluator are rebutted, *KRS 342.315(2) does not restrict the authority of the fact-finder to weigh the conflicting medical evidence. In instances where a fact-finder chooses to disregard the testimony of the university evaluator, a reasonable basis for doing so must be specifically stated.* *Id.* at 98 (emphasis added). Yet, in coal workers' pneumoconiosis claims, the authority of the fact-finder to weigh the conflicting medical evidence is *restricted.*

Based upon the language of KRS 342.316, along with the relevant subsec-

tions of KRS 342.315 and KRS 342.794, we believe that coal workers' pneumoconiosis claimants are subjected to much more stringent statutory treatment than all other pneumoconiosis claimants. Specifically, a coal workers' pneumoconiosis claimant must endure a more exacting procedure to prove his claim and is subjected to a much higher rebuttable standard,[10] if rebuttable at all (in life, at least).[11]

### 2. Benefits

Perhaps in an attempt to justify the disparate treatment between coal workers' pneumoconiosis and other pneumoconiosis stemming from the two-step "consensus" procedure and the "clear and convincing" evidentiary standard, KRS 342.732 offers different benefits for coal claimants than KRS 342.730, which generally addresses the determination of income benefits for disability. Thus, some of these coal workers' pneumoconiosis benefits, although they still require a "consensus finding" of

**10.** We acknowledge that our conclusion that coal workers' pneumoconiosis claimants are subjected to a much higher rebuttable standard, at first blush, seems to contravene this Court's logic in *Durham v. Peabody Coal Co.*, 272 S.W.3d 192 (Ky.2008). In *Durham*, this Court stated that "KRS 342.316(13) imposes no greater burden than on any other worker whose evidence is met with very persuasive contrary evidence":

> *Although KRS 342.316(13) may appear to be discriminatory, it does not actually impose a greater burden of proof on workers who claim benefits under KRS 342.732.* All claimants bear the burden of proof and the risk of nonpersuasion before the ALJ with regard to every element of a workers' compensation claim. In order to sustain that burden, a claimant must go forward with substantial evidence to prove each element, in other words, with evidence sufficient to convince reasonable people. Such evidence has also been equated to evidence sufficient to survive a defendant's motion for a directed verdict if the matter were being tried to a jury. When met with

equally convincing evidence, the claimant must offer more persuasive evidence in rebuttal or lose. When met with evidence more convincing than his own, a claimant's burden on rebuttal is even higher. KRS 342.316(13) acknowledges that reality.

272 S.W.3d at 196 (emphasis added). This viewpoint, however, would require us to ascribe an unreasonable meaning to language and ignores our decision in *Fox*, which specifically rejected an argument that a university evaluator's findings could only be overcome by introducing "clear and convincing" evidence. 19 S.W.3d at 95. In fact, in discussing *Fox*, this Court stated that "KRS 342.316(13) ... adopts the more stringent 'clear and convincing evidence' standard for rebuttal" compared to KRS 342.315(2). *Bartrum*, 168 S.W.3d at 385. Moreover, *Durham* ignored the improbability of "clearly and convincingly" rebutting "consensus experts," all of whom are physicians, with just another contradictory X-ray and another medical expert—that is other than a pathologist with actual slides if the claimant is then deceased.

**11.** *See supra* note 8.

pneumoconiosis, do not require proof of the impairment. For instance, KRS 342.732(*l*)(a) 1. entitles those who suffer from Category 1 coal workers' pneumoconiosis (as determined by a consensus) to a "retraining incentive benefit" (RIB) without submitting proof that the condition produces a permanent impairment rating:

> If an employee has a radiographic classification of category 1/0, 1/1 or 1/2, coal workers' pneumoconiosis and spirometric test values of eighty percent (80%) or more, the employee shall be awarded a one (1) time only retraining incentive benefit which shall be an amount equal to sixty-six and two-thirds percent (66–2/3%) of the employee's average weekly wage as determined by KRS 342.740, but not more than seventy-five percent (75%) of the state average weekly wage, payable semimonthly for a period riot to exceed one hundred four (104) weeks....

This benefit requires that he or she quit working in the coal mines, KRS 342.732(1)(a)8., and attend school, KRS 342.732(*l*)(a)2. However, only a de minimis number of coal workers who filed claims received a RIB from 2003 to 2010.[12] Furthermore, in lieu of a RIB, KRS 342.732(*l*)(a)7. entitles workers who are at least 57 years old on the date of the last exposure to elect to receive up to 425 weeks of benefits based on a 25% disability rating without actually proving a permanent impairment rating:

> An employee who is age fifty-seven (57) years or older on the date of last exposure and who is awarded retraining incentive benefits under subparagraphs 1. to 4. of this paragraph, *may elect to receive in lieu of retraining incentive benefits,* an amount equal to sixty-six and two-thirds percent (66–2/3%) of the employee's average weekly wage, not to exceed seventy-five percent (75%) of the state average weekly wage as determined by KRS 342.740 multiplied by the disability rating of twenty-five percent (25%) for a period not to exceed four hundred twenty-five (425) weeks, or until the employee reaches sixty-five (65) years of age, whichever occurs first....

(Emphasis added).[13] We note, however, that these presumptions equate with expected medical findings for coal workers' pneumoconiosis. *Holmes,* 872 S.W.2d at 455 ("The presumptions employed in KRS 342.732 bear both a direct and rational connection to the medical realities concerning the seriousness of the degree of coal workers' pneumoconiosis present in a given worker.").

In contrast, KRS 342.730 does not offer equivalent benefits for non-coal pneumoco-

---

12. According to the Kentucky Department of Workers' Claims for Retraining Incentive Benefits, only 11 coal workers received a RIB in 2003, 23 received a RIB in 2004, 2 in 2005, 26 in 2006, 9 in 2007, 5 in 2008, and 4 in 2009. No RIB benefits were reported in 2010, but presumably this is a result of the Court of Appeals' opinions in the cases currently before this Court.

13. Although not pertinent to the case before us, we also note that KRS 342.732(*l*)(e) entitles workers who prove the presence of complicated pneumoconiosis (A, B, or C) to total disability income benefits without actual proof of the cause or the extent of the occupational disability:

> If it is determined that an employee has radiographic classification of 3/2 or 3/3 occupational pneumoconiosis and respiratory impairment evidenced by spirometric test values of less than fifty-five percent (55%) of the predicted normal values, or *complicated pneumoconiosis (large opacities category A, B, or C progressive massive fibrosis),* there shall be an irrebuttable presumption that the employee is totally disabled resulting from exposure to coal dust, and *the employee shall be awarded income benefits* ...

(Emphasis added).

niosis claimants without proof and a finding of an actual impairment. Moreover, coal workers seeking benefits pursuant to KRS 342.732(*l* )(a)l. or 7. are bound by the unequivocal restrictions enunciated by KRS 342.732(6):

> In no event shall income benefits awarded under this section be stacked or added to income benefits awarded under KRS 342.730 to extend the period of disability and *in no event shall income or retraining incentive benefits be paid to the employee while the employee is working in the mining industry in the severance or processing of coal as defined in KRS 342.0011(23)(a).*

(Emphasis added). The essential point, however, is that all coal mining claimants, including those seeking benefits, or even retraining benefits, are subjected to the two-step "consensus" procedure and corresponding "clear and convincing" evidentiary standard of KRS 342.316, as well as the statute's minimum exposure requirement in the processing of their claims:

> Income benefits for the disease of pneumoconiosis resulting from exposure to coal dust or death therefrom shall not be payable unless the employee has been exposed to the hazards of such pneumoconiosis in the Commonwealth of Kentucky over a continuous period of not less than two (2) years during the ten (10) years immediately preceding the date of his or her last exposure to such hazard, or for any five (5) of the fifteen (15) years immediately preceding the date of such last exposure.

KRS 342.316(4)(b).

With this statutory framework and the delineation of pneumoconiosis in mind, we now turn to the facts of the two cases before us.

## II. BACKGROUND

### A. The Gardner Claim

Jesse Gardner was born in 1946. He filed an application for benefits under KRS 342.732 on August 15, 2007, after working as an underground coal miner for 37 years. The application stated that his last exposure to coal dust occurred on January 31, 2005. He did not assert a specific respiratory impairment.[14]

The parties subsequently submitted the following evidence:

| Party | "B" reader | X-ray Date | Quality grade | Category [15] |
|---|---|---|---|---|
| Claimant | Dr. Powell | 07/13/2007 | 2 | 2/2 |
| Employer | Dr. Wiot | 12/27/2007 | 1 | 0/0 |

Because the parties' reports were not in consensus, the Office of Workers' Claims (now the Department of Workers' Claims) hired a panel of three randomly-selected "B" readers to whom they submitted the X-rays with directions to choose the better quality X-ray and render a report of that X-ray. The panel reported as follows:

| "B" reader | X-ray date | Quality grade | Category |
|---|---|---|---|
| Dr. Anderson | 12/27/2007 | 2 [16] | 1/0 |
| Dr. Jarboe | 12/27/2007 | 1 | 0/0 |
| Dr. Pope | 12/27/2007 | 2 | 0/0 |

The Office then notified the parties that the panel consensus was category 0/0.

---

14. Thus, Gardner's *potential* entitlement under Chapter 342 would have included a RIB, for which he would not have had to go to occupational rehabilitation schools, since he was over 57 years of age at the time. *See* KRS 342.732(*l* )(a).

15. This refers to the category of disease.

16. Dr. Anderson noted that the X-ray was underexposed and mottled.

Gardner then submitted in rebuttal an additional report in which another physician, Dr. Baker, gave the December 27, 2007 X-ray a quality grade of 1 and opined that it revealed parenchymal abnormalities consistent with category 1/0 pneumoconiosis.

Gardner thereafter testified at the hearing concerning the coal mine employers for whom he had worked and the nature of the work that he performed underground. He also testified to experiencing increasing difficulty breathing during the past year, particularly if he walked quickly, climbed steps, or carried something that was heavy. He stated that he began to smoke when was about 16 years old and smoked about a pack a day until quitting many years ago. He also stated that no physician informed him that he suffered from pneumoconiosis until Dr. Powell diagnosed the condition in August 2007.

In spite of his 37 years' experience in underground coal mining,[17] as well as the subsequent X-ray and testimonial evidence of pulmonary dysfunction, the ALJ dismissed Gardner's claim, finding that he *failed to rebut* the presumption that the consensus classification was correct with clear and convincing evidence to the contrary. Affirming, the Board noted that, as an administrative tribunal, it lacked jurisdiction to decide Gardner's constitutional question. *See Blue Diamond Coal Company v. Cornett,* 300 Ky. 647, 189 S.W.2d 963 (1945). As noted, however, the Court of Appeals panel reversed, holding that both the consensus procedure and the clear and convincing evidentiary standard for rebutting a panel consensus were unconstitutional.[18]

### B. The Martinez Claim

Joe Martinez was born in 1937.[19] He filed an application for benefits under KRS 342.732 on October 24, 2002, after working as an underground coal miner for 34 years. His application stated that his last exposure to coal dust occurred on October 1, 2000. He did not assert a specific respiratory impairment.[20]

The parties subsequently submitted the following evidence:

| Party | "B" reader | X-ray Date | Quality grade | Category |
|-------|------------|------------|---------------|----------|
| Claimant | Dr. Baker | 05/17/2002 | 3 | 1/0 |
| Employer | Dr. Pope | 12/23/2002 | 2 | negative |

17. In previous years, disability was presumed upon a finding of pneumoconiosis and ten years of service:

Where the occupational disease is a compensable pneumoconiosis and there has been employment exposure for ten (10) years or more to an industrial hazard sufficient to cause the disability of pneumoconiosis, there shall be a rebuttable presumption that the disability or death was due to the compensable pneumoconiosis.

*Wells v. Hamilton,* 645 S.W.2d 353, 355 (Ky. App.1983) (setting forth an earlier version of KRS 342.316(5)); *see also Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 27–29, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (upholding a federal statute providing that "a coal miner with 10 years' employment in the mines who suffers from pneumoconiosis will be presumed to have contracted the disease from his employment" since there was a strong rational connection between proving long exposure to mine work and respiratory ailments, and developing pneumoconiosis."). As illustrated by the claims addressed, the length of exposure, is now insufficient to rebut a "consensus."

18. One member of the panel, Judge Keller, dissented from the majority opinion to the *extent that the opinion found the consensus* procedure to violate equal protection, yet Judge Keller did find the "clear and convincing" standard to be unconstitutional.

19. In its brief, Peabody Coal Company obliquely argues that Martinez lacks standing in this appeal. However, we disagree.

20. Thus, Martinez's potential entitlement would have also included a RIB. *See supra* note 14.

Because the parties' reports were not in consensus, the Office of Workers' Claims hired a panel of three randomly-selected "B" readers to whom they submitted the X-rays with directions to choose the better quality X-ray and render a report of that X-ray. The panel reported as follows:

| "B" reader | X-ray date | Quality grade | Category |
|---|---|---|---|
| Dr. Rosenberg | 12/23/2002 | 2 | 0/1 |
| Dr. Ramakrishnan | 12/23/2002 | 2 | 0/0 |
| Dr. Dineen | unknown | 1 | 0/0 |

The Office then notified the parties that the panel consensus was category 0/0. There is no indication that either party submitted any rebuttal evidence.

In spite of Martinez's 34 years' experience in underground coal mining, the ALJ dismissed the claim, finding that he failed to rebut the consensus classification with clear and convincing evidence. As in the Gardner case, the Board noted it lacked jurisdiction to decide the constitutional question that Martinez raised and thus affirmed. The Court of Appeals also reversed, holding that both the consensus procedure and the clear and convincing evidentiary standard for rebutting a panel consensus were unconstitutional.[21]

To properly assess whether this procedure and the evidentiary standard are unconstitutional, we must now examine the purposes, tests, and precedents with respect to equal protection under the law as recognized by both the United States and Kentucky Constitutions.

## III. EQUAL PROTECTION

Citizens of Kentucky enjoy equal protection of the law under the 14th Amendment of the United States Constitution and Sections 1, 2, and 3 of the Kentucky Constitution. *D.F. v. Codell,* 127 S.W.3d 571, 575 (Ky.2003). Simply put, the 14th Amendment requires persons who are similarly situated to be treated alike. *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). And Sections 1, 2, and 3 of the Kentucky Constitution also provide that the legislature does not have arbitrary power and shall treat similarly situated persons equally.

■ In sum, the goal of the 14th Amendment to the United States Constitution, as well as Sections 1,2, and 3 of the Kentucky Constitution, is to "keep[ ] governmental decision makers from treating differently persons who are in all relevant respects alike."[22] *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). However, because nearly all legislation differentiates in some manner between different classes of persons, neither the federal nor state constitutions forbid such classification per se. *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Accordingly, the level of judicial scrutiny applied to an equal protection challenge depends on the classification made in the statute and the interest affected by it. *See Memorial Hospital v. Maricopa County,* 415 U.S. 250, 253, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).

■ Currently, there are three levels of review applicable to an equal protection challenge. *See, e.g., Steven Lee Enterpris-*

---

**21.** This panel was unanimous in determining that both the consensus procedure and the "clear and convincing" rebuttable standard were unconstitutional.

**22.** In so doing, the guarantee of equal protection inhibits oppression as achieved politically through division. In this respect, there is truth to the old maxim, "United, we stand, divided, we fall."

*es v. Varney*, 36 S.W.3d 391, 394–95 (Ky. 2000). Strict or intermediate scrutiny applies whenever a statute makes a classification on the basis of a "suspect"[23] or "quasi-suspect"[24] class, respectively.[25] *Codell*, 127 S.W.3d at 575–576 (discussing strict and intermediate scrutiny). Conversely, "if the statute merely affects social or economic policy, it is subject" to a less searching form of judicial scrutiny, i.e. the "rational basis" test. *Id.* at 575 (citation omitted).

■ Workers' compensation statutes concern matters of social and economic policy. *Cain v. Lodestar Energy, Inc.*, 302 S.W.3d 39, 42 (Ky.2009). As a result, such a statute is not subject to strict or immediate scrutiny and therefore must be upheld if a "rational basis" or "substantial and justifiable reason" supports the classifications that it creates:

> Statutes ... concerning social or economic matters generally comply with federal equal protection requirements if

the classifications that they create are rationally related to a legitimate state interest.... A statute complies with Kentucky equal protection requirements if a "reasonable basis" or "substantial and justifiable reason" supports the classifications that it creates.

*Id.* at 42–43 (footnotes omitted).

Although the rational basis standard certainly favors the government, it would be incorrect to state that courts always hold that legislatively-created classifications are rationally related to a legitimate state interest. The United States Supreme Court has made it abundantly clear that the three levels of review constitute guidelines for constitutional inquiry and are *not* dispositive edicts. *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("[W]e wish to dispel the notion that strict scrutiny is strict in theory, but fatal in fact.").[26] Furthermore, both our na-

**23.** Race, ethnicity, alienage, and national origin have been recognized by our nation's highest court as "suspect classes" subject to strict scrutiny. *See Regents of University of California v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."); *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) ("[C]lassifications based on alienage ... are inherently suspect and subject to close judicial scrutiny."); *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.").

**24.** Gender and illegitimacy have been recognized as "quasi-suspect classes" subject to intermediate scrutiny. *See United States v. Virginia*, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justi-

fication' for that action."); *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("[I]ntermediate scrutiny ... has been applied to discriminatory classifications based on ... illegitimacy.").

**25.** Strict scrutiny also applies "when a statute significantly interferes with the exercise of a fundamental right." *Codell*, 127 S.W.3d at 575 (citation omitted).

**26.** Although it did not address equal protection or the three levels of scrutiny, *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) further demonstrates that the standards and tests developed by the Supreme Court *actually mean something*. In that case, the court concluded that an activity must "substantially' affect" interstate commerce in order to be within Congress's power to regulate it under the Commerce Clause. *Id.* at 559, 115 S.Ct. 1624. Applying that test, the court held that Gun–Free School Zones Act, which made it a federal offense for any individual to knowingly possess a firearm in a place that the individual believes or has reasonable cause to believe is school zone, ex-

tion's highest court and this Court have, in several cases, recognized equal protection violations based upon the rational basis standard.

In *Allegheny Pittsburgh Coal Co. v. County Com'n of Webster County, W. Va.,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) and *City of Cleburne,* 473 U.S. 432, 105 S.Ct. 3249, the United States Supreme Court unanimously identified equal protection violations based upon the rational basis standard.[27,28] In *Allegheny,* a West Virginia county tax assessor valued the petitioner's real property on the basis of its recent purchase price, yet made only minor modifications in the assessments of land which had not been recently sold, thereby resulting in gross disparities in the assessed value of generally comparable property,[29] 488 U.S. at 338, 109 S.Ct. 633. The Supreme Court noted that a tax selection scheme may divide property into classes and assign to each class a different tax burden "[i]f the selection or classification is *neither capricious nor arbitrary,* and rests upon some *reasonable consideration of difference or policy ....*" *Id.* at 344, 109 S.Ct. 633 (citation and quotation marks omitted) (internal quotation omitted) (emphasis added). However, West Virginia had not drawn such a distinction; rather, the assessor, on her own initiative,

ceeded Congress's Commerce Clause authority. *Id.* at 561–562, 115 S.Ct. 1624. More pertinent to our analysis, this decision contravened the notion that Congress could justify its authority to pursue any legislative action by simply pointing to its commerce power despite failing to set forth any cognizable connection between the act and its affect on commerce. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 127, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (upholding application of the Agricultural Adjustment Act, which regulated the volume of wheat moving in interstate and foreign commerce, to the production and consumption of homegrown wheat).

27. In *City of Cleburne,* Justice Marshall, along with Justices Brennan and Blackmun, disagreed with the majority's "disclaimer that no 'more exacting standard' than ordinary rational-basis review [was] being applied." 473 U.S. at 456, 105 S.Ct. 3249 (Cooper, J., concurring in part and dissenting in part). The majority had held that "the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation." *Id.* at 442, 105 S.Ct. 3249. However, Justices Marshall, Brennan, and Blackmun joined the majority in recognizing an equal protection violation:

The Court holds that all retarded individuals cannot be grouped together as the "feebleminded" and deemed presumptively unfit to live in a community. Underlying this holding is the principle that mental retarda-

tion per se cannot be a proxy for depriving retarded people of their rights and interests without regard to variations in individual ability. *With this holding and principle I agree.*

*Id.* at 455–456, 105 S.Ct. 3249 (emphasis added).

28. The Supreme Court has found equal protection violations based on the rational basis standard in other circumstances. *See Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (holding that a Texas statute which withheld from local school districts any state funds for the education of children who were not "legally admitted" into the United States, and which authorized local school districts to deny enrollment to such children, was not rationally related to a legitimate state interest and therefore violated equal protection); *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (holding that an amendment to the Colorado Constitution that prohibited all legislative, executive, or judicial action at any level of state or local government designed to protect homosexual persons from discrimination was not rationally related to a legitimate state interest and therefore violated equal protection).

29. Specifically, the petitioner's property had been assessed at roughly 8 to 35 times more than comparable neighboring property, and these discrepancies continued for more than ten years with little change. *Allegheny,* 488 U.S. at 344, 109 S.Ct. 633.

applied the state tax laws in a manner resulting in the disparity. *Id.* at 345, 109 S.Ct. 633. Because it had "no doubt that [the] petitioners ha[d] suffered from ... 'intentional systematical undervaluation by state officials' of comparable property in" the same county, the court held that the practice "denied [the] petitioners the equal protection of the laws. . . ." *Id.* at 338, 346, 109 S.Ct. 633.

In *City of Cleburne*, a Texas city denied a special use permit for the operation of a group home for the mentally retarded pursuant to a municipal zoning ordinance requiring permits for such homes. 473 U.S. at 435, 105 S.Ct. 3249. Our nation's highest court stated that "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts [should be] very reluctant ... to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *Id.* at 441–442, 105 S.Ct. 3249. However, the court refused to countenance arbitrary classifications:

> The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives—such as "a bare ... desire to harm a politically unpopular group," ... are not legitimate state interests.

*Id.* at 446–447, 105 S.Ct. 3249 (citations omitted). "Because ... the record [did] not reveal any *rational basis* for believing

that the [group] home would pose any special threat to the city's legitimate interests," the court deemed the ordinance invalid as applied. *Id.* at 448, 105 S.Ct. 3249 (emphasis added).

Following in the footsteps of the United States Supreme Court, this Court has also found equal protection violations based upon the rational basis standard.[30] For instance, in *Commonwealth Natural Resources and Environmental Protection Cabinet v. Kentec Coal Co., Inc.,* 177 S.W.3d 718, 723 (Ky.2005), the procedure of the Natural Resources and Environmental Protection Cabinet required prepayment before mining permittees could obtain a formal hearing to challenge an assessment. Importantly, the procedure allowed individuals, but not corporations, a means to obtain a waiver from the prepayment requirements. *Id.* Moreover, it was uncontroverted that Kentec Coal Company could not afford to post the bond requested to contest the assessment on appeal. *Id.* We could not "discern any rational basis, or legitimate state interest, to explain—much less justify—the arbitrary singling out of a corporation (from individuals) for such disparate treatment." *Id.* at 726. Stated succinctly, we found this treatment to be repugnant to our conception of equal protection:

> It is just not within our democratic ideas, customs or maxims to grant equal justice and due process only to those who can afford to pay and to deny such rights to those who cannot. Such a

---

**30.** The Kentucky Supreme Court has found equal protection violations based on the rational basis standard in other circumstances. *See Codell,* 127 S.W.3d 571 (holding that statute revoking driving privileges for high school dropouts and academically deficient students was not rationally related to issue of whether a student's local school district operated an alternative education program and thus vio-

lated equal protection); *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.,* 163 S.W.3d 408 (Ky.2005) (holding that a statutory 10% penalty against unsuccessful appellants in second appeals from superseded money judgments was not rationally related to a legitimate state interest and therefore violated equal protection).

notion flies in the face of the belief of "equal justice under the law."

*Id.* at 725.[31]

■ Thus, our precedent, along with that of the United States Supreme Court, demonstrates that the rational basis standard, while deferential, is certainly not demure. This standard encompasses the long held principle that "[c]lassification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, *and can never be made arbitrarily,* and without any such basis.'" *McLaughlin v. State of Fla.,* 379 U.S. 184, 190, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (citation omitted) (emphasis added); *see also Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) ("Under 'traditional' equal protection analysis, a legislative classification must be sustained *unless it is 'patently arbitrary'* and bears no rational relationship to a legitimate governmental interest.") (emphasis added); *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.,* 163 S.W.3d 408, 414 (Ky.2005) (" '[A]rbitrary and irrational' discrimination violates the Equal Protection Clause *even under the rational-basis standard of review.*") (footnote omitted) (emphasis added). Simply put, arbitrary selection " 'can never be justified by calling it classification.'" *McLaughlin,* 379 U.S. at 190, 85 S.Ct. 283 (citation omitted).[32]

Having set forth the differing statutory evidentiary treatment of pneumoconiosis claims, the background of the two cases on appeal, and the purposes, tests, and precedents with respect to equal protection, we will now address whether the procedure and evidentiary standard that KRS 342.316 applies only to coal workers' pneumoconiosis claimants infringes upon coal workers' rights to equal protection under the law.

## IV. ANALYSIS

■ Gardner and Martinez assert that both the "consensus procedure" and the "clear and convincing" evidentiary standard KRS 342.316 applies to coal workers' pneumoconiosis claims violate the rights of coal workers to equal protection under the law. The claimants contend that the statute unfairly and unlawfully discriminates against coal workers who are injured by, and through exposure to coal dust, as opposed to workers who suffer from pneumoconiosis from other sources. According to the claimants, this unfavorable treatment is arbitrary, capricious, and not rationally related to any legitimate state interest. Moreover, they allege there no substantial and justifiable reason to support it exists. Our analysis begins with the presumption that legislative acts are constitutional. *United Dry Forces v. Lewis,* 619 S.W.2d 489 (Ky.1981); *Sims v. Board of Education of Jefferson County,*

---

31. Although he contended that the classification between individuals and corporations was rationally related to a legitimate state interest, Justice Cooper acknowledged that the rational basis for differing treatment relates to fundamental distinctions, if any, between the groups affected. *Kentec Coal Co., Inc.,* 177 S.W.3d at 739 (Cooper, J., concurring in part and dissenting in part) ("In other words, fundamental differences between corporations and individuals can give rise to rational bases for imposing differential burdens between the two.").

32. The *McLaughlin* language is quite similar to a pronouncement made by this Court in *Holmes,* 872 S.W.2d at 452:

The legislature may not arbitrarily designate the severed factions of the original unit as two classes and thereupon enact different rules for the government of each. It is equally established that the classification, as made, must be based upon some reasonable and substantial difference in kind, situation or circumstance which bears a proper relation to the purpose of the statute.

290 S.W.2d 491 (Ky.1956); *Brooks v. Island Creek Coal Co.*, 678 S.W.2d 791 (Ky. App.1984).

Although we have considered other equal protection challenges before, this is the first challenge based on the less favorable statutory evidentiary treatment to which coal workers' pneumoconiosis claimants are subjected compared to all other pneumoconiosis claimants.[33] In *Holmes*, 872 S.W.2d at 448–449, a coal company[34] contested the benefits afforded coal workers' pneumoconiosis claimants pursuant to KRS 342.732. With respect to its equal protection challenge, the coal company essentially argued that the statute's irrebuttable presumption of total disability discriminated unlawfully between coal companies and businesses in other industries.[35] We disagreed, as the statute was designed to deal with the undue burden being placed on other Kentucky industries at the time by the coal industry:

> We find that KRS 342.732 ... was a part of a comprehensive revamping of the entire Kentucky Workers' Compensation Act. *This was a clearly demonstrated response to the widely recognized need to deal with the ominous burden placed on all of Kentucky industry, through Special Fund assessments, by the cost of workers' compensation claims relating to the coal industry.* It was a founded fear that because of the burgeoning cost of workers' compensation, particularly due to the pay-as-you-go method of Special Fund financing, industries would leave the state or fail to locate in Kentucky, thereby increasing unemployment. *Approximately 78% of the Special Fund's overall liability and over 95% of its liability for occupational disease was attributable to the coal industry.*[36]

*Id.* at 452–453 (emphasis added). Thus, there was a rational basis for the disparate treatment we reviewed at the time. Moreover, a classification upheld for one purpose does not *ipso facto* justify a classification made for another purpose. *Compare Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) (holding that a Florida statute giving widows, but not widowers, a $500 exemption from property taxation did not violate equal protection), *with Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) (holding that a Missouri law denying a widower workers' compensation benefits for his wife's work-related death unless he was either mentally or physically

**33.** In *Bartrum*, 168 S.W.3d at 385, this Court determined only that the consensus procedure found in KRS 342.316 did not deny due process to workers who suffer from coal workers' pneumoconiosis.

**34.** Besides Kentucky Harlan Coal Company, the Department of Mines and Minerals and the Special Fund were also "arrayed against the constitutionality of the statute." *Holmes*, 872 S.W.2d at 449.

**35.** While not specifically characterized as such in *Holmes*, this was obviously the issue addressed, as the coal company would not have had standing to argue that KRS 342.732 unfairly and unlawfully discriminated against workers who suffer from pneumoconiosis contracted from sources other than coal dust.

**36.** The rationalization set forth by the *Holmes* court has been extracted from its analysis of Section 59 of the Kentucky Constitution, which prevents special privileges, favoritism, and discrimination, as well as insures equality under the law. 872 S.W.2d at 451–454. However, this rationalization applies with equal force to equal protection analysis:

> Where the classification enacted by the legislature in the statute has a reasonable basis, such law does not constitute special or local legislation within the prohibition of Section 59 of the Kentucky Constitution *nor does it deny the equal protection guaranteed by the United States Constitution.*

*Id.* at 452 (emphasis added).

incapacitated or could prove dependence on his wife's earnings, but granting a widow death benefits without proof of dependence, violated equal protection). Each classification must be measured by its relation to the alleged governmental purpose. *See* 16B C.J.S. Constitutional Law § 1108 (stating that the guarantee of equal protection "prohibit[s] the state from according unequal treatment to persons placed by a statute into classes for reasons wholly unrelated to the purpose of the legislation or a legitimate state purpose.") (*citing Cherokee County v. Greater Atlanta Homebuilders Ass'n, Inc.*, 255 Ga.App. 764, 566 S.E.2d 470 (2002)). Finally, as we have noted, in *Holmes*, this Court found the presumptions under attack to equate to the expected medical findings for coal workers' pneumoconiosis. 872 S.W.2d at 455 ("The presumptions employed in KRS 342.732 bear both a direct and rational connection to the medical realities concerning the seriousness of the degree of coal workers' pneumoconiosis present in a given worker."). "[I]t is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 28, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (*quoting Mobile, J. & K.C.R. Co. v. Turnipseed*, 219 U.S. 35, 43, 31 S.Ct. 136, 55 L.Ed. 78 (1910)).

In *Durham v. Peabody Coal Co.*, 272 S.W.3d 192, 194 (Ky.2008), coal workers argued that the consensus procedure of KRS 342.316 discriminated unlawfully between workers who are injured by a harmful occupational exposure to coal dust and those who become physically disabled by a traumatic injury. This Court then rejected their argument because "inherent differences between coal workers' pneumoconiosis and traumatic injuries provide a

reasonable basis or substantial and justifiable reason for different statutory treatment[ ]":

> *Pneumoconiosis develops gradually and can be difficult to diagnose, as illustrated by the disparity in x-ray interpretations offered in each of these cases.* The court noted in *Kentucky Harlan Coal Company v. Holmes*, 872 S.W.2d 446 (Ky.1994), that when amending KRS 342.316 and enacting KRS 342.732 in 1987, legislators relied on testimony from medical experts that coal workers who suffer from pneumoconiosis should be encouraged to find other employment but that even category 3 simple pneumoconiosis is not usually associated with any significant decrease in lung function. The court also noted that the 1987 amendments were a legislative attempt to control the cost of coal workers' pneumoconiosis claims, particularly by workers with no significant respiratory impairment. The present statutes address those same concerns. *As a rule, traumatic injuries occur suddenly and are more easily diagnosed.* Workers who sustain traumatic injuries are not, as a rule, advised to change employment to avoid the risk of further injury.

*Id.* at 195–196 (emphasis added).

Although we rejected equal protection challenges in *Holmes* and *Durham*, we found an as-applied equal protection violation with respect to the KRS 342.316 consensus procedure in *Cain*, 302 S.W.3d 39. In that case, the claimant, seeking a RIB award, submitted a "B" reader's report that showed the existence of category 2/1 pneumoconiosis while his employer submitted evidence that he suffered only from category 1/1 disease; both submissions supported the claimant's entitlement to a RIB award. *Id.* at 43. Nonetheless, because the reports were not in consensus, KRS 342.316(3)(b) 4.e. required the claim

to be submitted to a consensus panel and the appointed panel subsequently reached a consensus of category 0 and the ALJ thereafter dismissed the claim. *Id.* at 41, 43. Thus, we unanimously concluded that the statute denied the claimant equal protection because there was "no rational or reasonable basis for such discrimination [37] where the employer's evidence effectively concedes the worker's entitlement to a RIB." *Id.* at 43.

Here, KRS 342.316(3), along with the relevant subsections of KRS 342.315 and KRS 342.794, treat coal workers' pneumoconiosis claimants more stringently than all other pneumoconiosis claimants. However, even though the disease is given different names depending upon the source of dust, there is no "natural" or "real" distinction between coal workers' pneumoconiosis and other forms of pneumoconiosis.

As a result, we believe this case significantly differs from *Durham* and *Holmes.* Unlike *Durham,* different names do not justify differing treatment—*all* forms of pneumoconiosis (whatever type) develop gradually and can be difficult to diagnose. Furthermore, unlike *Holmes,* we discern no rational basis or substantial and justifiable reason for the singular two-step "consensus procedure" or the "clear and convincing" evidentiary standard, as it is simply counterintuitive to prescribe differing standard of proof requirements *for the same disease.* Nor can the disparate treatment of coal workers be justified as a cost-saving measure, as it is axiomatic that, if the enhanced procedure saves money, the state would save more money

by subjecting *all* occupational pneumoconiosis claimants to the more exacting procedure and higher rebuttable standard. Finally, we reject any contention that the two-step procedure promotes prompt and efficient processing of coal mining pneumoconiosis cases, as an additional step presents nothing more than another formidable hurdle for the coal worker before he or she can receive compensation.

Rather than rely upon *Durham* and *Holmes,* we liken this case to those circumstances in which this Court or the United States Supreme Court identified an equal protection violation. Again, whether caused by coal, rock, asbestos, or brick dust, "pneumoconiosis is pneumoconiosis is pneumoconiosis." *Holmes,* 872 S.W.2d 446, 456 (Ky.1994) (Stephens, C.J., dissenting) (quotation marks omitted). Therefore, we follow our nation's highest court's decisions in *Allegheny* and *City of Cleburne* and refuse to countenance an arbitrary classification, i.e. prescribing differing standard of proof requirements *for the same disease.*

Moreover, we believe any venal element to an initial doctors' medical diagnosis [38] in the context of coal workers' pneumoconiosis would apply with equal force to pneumoconiosis caused by asbestos, rock, or metal dust. To hold otherwise, we must assume that doctors providing the initial diagnosis for all other types of pneumoconiosis are inherently more trustworthy, and thus the additional consensus panel is only necessary to defend against physicians that testify for coal workers. There is no basis for such an assumption limited

---

**37.** The discrimination stemmed from the differing treatment afforded the claimant versus "a similarly-situated worker whose employer also submitted evidence of category 1 disease but whose claim was not subject to the second phase of the consensus process." *Cain,* 302 S.W.3d at 43.

**38.** Initial diagnoses are provided by physician "B" readers paid by the parties who often differ on issues as basic as the presence of the disease.

to physicians from the coal fields of Kentucky and it belies common sense; it encapsulates the very meaning of arbitrariness, irrationality, and unreasonableness.[39]

Because we consider the classification of coal workers' pneumoconiosis claimants to be arbitrary in regard to the more stringent proof or procedures required and believe that the disparate treatment afforded such workers lacks a rational basis or substantial justification, we hold that the consensus procedure and the clear and convincing evidentiary standard are unconstitutional.

We pause, though, to address the contention that the preferential treatment afforded coal workers pursuant to KRS 342.732 justifies the more stringent procedural and evidentiary requirements of KRS 342.316.[40] Simply put, one type of disparate treatment does not constitute a rational basis or substantial and justifiable reason for another form of disparate treatment.[41,42] Although certainly by no means

**39.** Chief Justice Minton emphasizes this argument in his dissent, as he argues the "[l]egislative history reveals the 2002 General Assembly's concern with preventing 'doctor shopping' and the need to obtain unbiased medical opinions," However, this argument overlooks the fact the university evaluator system was already in place for all pneumoconiosis claims. The 2002 amendments added the consensus procedure and the "clear and convincing" standard for rebutting a consensus—yet both the claimant and employer must still secure separate medical opinions to support or defend against the claims.

**40.** Along with the distinction in benefits, we are not unmindful that funding sources for coal workers' pneumoconiosis claims and other such claims differ:

(a) Income benefits for coal-related occupational pneumoconiosis shall be paid fifty percent (50%) by the Kentucky coal workers' pneumoconiosis fund as established in KRS 342.1242 and fifty percent (50%) by the employer in whose employment the employee was last exposed to the hazard of that occupational disease.

(b) Compensation for all other occupational disease shall be paid by the employer in whose employment the employee was last exposed to the hazards of the occupational disease.

KRS 342.316(11). Although the foregoing statute provides for different payment sources depending on the etiology of the disease, this is insufficient to establish a rational basis for imposing additional burdens based solely on the *source* of the claimant's disease, rather than on the *presence* of the disease, and we can find no other reason for the disparity.

**41.** In his dissent, Chief Justice Minton argues that "[t]he Federal Circuit Court of Appeals held that because one group received special benefits they were not similarly situated to other groups, rendering the Equal Protection guarantee inapplicable." *See Absher v. United States*, 805 F.2d 1025, 1026–27 (Fed.Cir.Ct. App.1986). In *Absher*, 805 F.2d at 1025–1026, disabled military retirees brought an equal protection challenge to the constitutionality of 38 U.S.C. §§ 3104–3105 (1982), which precluded them from receiving both military retirement pay and Veteran's Administration disability compensation at the same time. Instead, each was required to waive (taxable) retirement pay equal in amount to any VA (tax exempt) compensation received. *Id.* at 1025. The Federal Circuit Court of Appeals rejected the challenge, as it did not consider the military retirees similarly situated with other federal civil retirees:

The Claims Court, of course, took the position that "[t]he special benefits accorded retirees of the uniformed services are such that this class of individuals is not situated similarly to other groups that are not required to waive retirement pay to receive tax-free VA benefits.".... We do not therefore discern error in the legal conclusion of the Claims Court.

*Id.* at 1026–1027.

In so doing, the court confused causation with correlation. Specifically, disabled military retirees presumably receive special benefits because they are a distinct class, *but they are not a distinct class because they receive special benefits.* To hold otherwise would allow legislative bodies to obviate the guarantee of Equal Protection by conferring nominal benefits to justify disparate treatment and thereby ignore the United States Supreme

equivalent, such an argument brings to mind the United States Supreme Court's famous proclamation that "[s]eparate educational facilities are inherently unequal." *Brown v. Board of Ed. of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In considering an equal protection challenge, a court does not engage in accounting of debits and credits; rather, the court must examine whether similarly situated individuals have been treated differently in that instance and, if so, whether or not such treatment is rationally related to a legitimate state interest. And, as we noted above, a classification upheld for one purpose does not *ipso facto* justify a classification made for another purpose; each classification must be measured by its relation to the alleged governmental purpose.

## V. CONCLUSION

Having carefully reviewed the record and the arguments of the parties, we cannot discern a rational basis or substantial and justifiable reason for the disparate treatment of coal workers in this instance. Pneumoconiosis caused by exposure to coal dust is the same disease as pneumoconiosis caused by exposure to dust particles in other industries, yet coal workers face different, higher standard-of-proof requirements than those other workers. This is

an arbitrary distinction between similarly situated individuals, and thus it violates the equal protection guarantees of the Federal and State Constitutions.

For the foregoing reasons, the decisions of the Court of Appeals in these cases are affirmed.

CUNNINGHAM, NOBLE, and VENTERS, JJ., concur. SCHRODER, J., concurs in part and dissents in part by separate opinion. MINTON, C.J., dissents by separate opinion in which ABRAMSON, J., joins.

SCHRODER, J., concurring in part and dissenting in part:

I agree that requiring only individuals who acquired pneumoconiosis from coal mine employment to satisfy a "consensus" requirement, and a higher evidentiary burden of proof to rebut said "consensus" in order to receive workers' compensation benefits, unconstitutionally discriminates against similarly situated people and denies equal justice under the law.

However, I disagree with the assessment that the violation is a result of the application of higher burdens of proof and the consensus requirement under KRS 342.316(3) and 342.316(13). Rather, the violation occurs as a result of the language of KRS 342.316(3)(b)4.b., which provides

Court's exhortation that arbitrary selection " 'can never be justified by calling it classification.' " *McLaughlin*, 379 U.S. at 190, 85 S.Ct. 283 (citation omitted).

The matter before us today illustrates such a concern. Again, only 11 coal workers received a RIB in 2003, 23 received a RIB in 2004, 2 in 2005, 26 in 2006, 9 in 2007, 5 in 2008, 4 in 2009, and none in 2010, even though Chief Justice Minton's dissent acknowledges that there were at least 3,279 coal workers' pneumoconiosis claims from 2001–2010. *See supra* note 12. Simply put, such a miniscule "benefit" cannot justify foreclosing coal workers' pneumoconiosis claimants from being subjected to the same procedure and

rebuttable standard as other pneumoconiosis claimants.

42. Chief Justice Minton also notes that a statute "may be upheld over an [E]qual [P]rotection argument when a party is caused to bear a different economic burden or enjoys a different economic benefit." *Stephens v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 624, 627 (Ky.1995). We agree, assuming "there is a reasonable basis or rational justification" for the differing treatment. *Id.* However, we reiterate that conferring a miniscule benefit does not justify disparate treatment.

that "[t]he commissioner shall assign the claim to an administrative law judge and, *except for coal workers' pneumoconiosis claims,* shall promptly refer the employee to such physician or medical facility as the commissioner may select for examination." (Emphasis added.) It is this part of the statute which excludes individuals who acquired pneumoconiosis from coal mine dust from an evaluation of their claim under the rules and procedures applicable to all other claims of disability related to pneumoconiosis acquired through other mechanisms.

That being said, the legislature can and often does provide additional benefits or incentives to discrete classes of people. In its wisdom, it has decided to offer retraining benefits and has eliminated the need to prove impairment in claims where there is objective radiographic evidence of the disease. The increased evidentiary standards and the requirement of a consensus reading in certain cases do not, in that case, run afoul of constitutional equal protection.

For example, under the implementing regulations of the federal Black Lung Benefits Act, 30 U.S.C. § 801 *et seq.,* there exists an irrebuttable presumption of disability or death due to pneumoconiosis in light of certain radiographic evidence of the disease. However, in order to be entitled to this presumption, there are more strict standards that must be met in terms of radiographic evidence. 20 CFR §§ 718.102, 718.304. Coal miners without radiographic evidence of the disease are excluded from the presumption; however, they are not automatically excluded from benefits, as they can still pursue their claim using other medical evidence to establish total disability due to pneumoconiosis.

The stated purpose for the classification of "cost savings" does in fact bear a rational relationship to a legitimate state interest with respect to requirements under KRS 342.316(3) and 342.316(13). These provisions are designed to limit the additional retraining benefit, or benefits in lieu of retraining, to individuals with radiographic evidence of the disease, without requiring them to prove a permanent impairment rating.

In contrast, although requiring a consensus of a panel of B Readers when the initial x-ray evidence conflicts and higher burdens of proof may effectively help control the costs associated with workers' compensation benefits, for the reasons identified by the majority, there is no rational relationship for singling out individuals who acquired pneumoconiosis from coal mine employment versus individuals who have acquired pneumoconiosis from any other means, with respect to pursuing their claim under KRS 342.316(3)(b)4.b.

To conclude, it is the provision of KRS 342.316(3)(b)4.b. that excludes individuals pursuing workers' compensation as a result of a pulmonary impairment related to coal mine exposure that violates equal protection. Nevertheless, the legislature could constitutionally provide additional presumptions and benefits to those with radiographic evidence of the disease, and require additional evidence and burdens of proof in order to secure such additional benefits. It just could not, constitutionally, exclude these individuals from pursuing their claim under KRS 342.316(3)(b)4.b., like every other similarly situated citizen, when the radiographic evidence is otherwise insufficient to meet the more stringent requirements under KRS 342.316(3) and 342.316(13).

MINTON, C.J., dissenting:

Under the rational basis review, this Court should not overturn legislative action on Equal Protection grounds "unless the varying treatment of different groups or persons is so unrelated to the achieve-

ment of any combination of legitimate purposes that we can only conclude that the [General Assembly's] actions were irrational."[43] And we should be "quite reluctant to overturn [legislative] action"[44] even if "the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous."[45] In my view, the majority opinion reaches its intended result by ignoring these well-settled tenets of law, invading the province of the legislature to force a sea-change in Workers' Compensation law and leaving Kentucky's Equal Protection precedent in shambles. Respectfully, I must dissent.

I would find that the consensus procedure and the clear and convincing burden of proof are both rationally related to the legitimate government objectives of obtaining unbiased medical diagnoses and prompt and efficient processing of occupational disease claims. Equal Protection law does not require a classification between coal-related pneumoconiosis claims and claims of pneumoconiosis from other dust sources to be based on science. Moreover, the special benefits awarded to coal workers with pneumoconiosis further justify applying different procedures and standards to coal-related pneumoconiosis claims.

Rather than enacting Kentucky Revised Statutes (KRS) 342.316(3) and (13) out of a desire to harm coal workers, as the majority opinion unfairly suggests, every expression by members of the 2002 session of the General Assembly supports the conclusion that the legislature intended the amendments to Chapter 342 to benefit coal workers by allowing coal miners with pneumoconiosis to receive more benefits in an efficient manner. Whether or not the amendments succeeded in achieving these goals is not the Court's concern under proper Equal Protection analysis. The deciding factor is that the legislature could have rationally believed the consensus procedure and the clear and convincing rebuttal standard would ensure unbiased, prompt, and efficient processing of coal-related pneumoconiosis claims. So I would uphold KRS 342.316(3) and (13).

## I. THE CONSENSUS PANEL AND THE CLEAR AND CONVINCING STANDARD FOR REBUTTAL ARE RATIONALLY RELATED TO THE LEGITIMATE GOVERNMENTAL OBJECTIVES OF UNBIASED, PROMPT, AND EFFICIENT PROCESSING OF CLAIMS.

"The 14th Amendment to the United States Constitution requires persons who are similarly situated to be treated alike."[46] Under federal Equal' Protection analysis, statutes concerning social or economic matters are examined under the rational basis test; and the classifications they make must be rationally related to a legitimate state interest.[47] "Sections 1,2, and 3 of the Kentucky Constitution provide that the legislature does not have arbitrary power and shall treat all persons equally. A statute complies with Kentucky [E]qual [P]rotection requirements if a 'reasonable basis' or 'substantial and justifiable reason' supports the classifications

43. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (citation omitted).

44. *Gregory v. Ashcroft*, 501 U.S. 452, 471, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (citations omitted).

45. *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (citations omitted).

46. *Durham v. Peabody Coal Co.*, 272 S.W.3d 192, 195 (Ky.2008) (citations omitted).

47. *Id.*

that it creates."[48] Essentially, the federal and state Equal Protection standards are the same; and a single analysis can be applied to both.[49]

Review of the legislative history surrounding the 2002 amendments of KRS Chapter 342 reveals at least two legitimate governmental objectives behind the consensus procedure and the clear and convincing rebuttal standard.[50] The 2002 General Assembly rationally could have believed they would secure unbiased medical diagnoses of coal-related pneumoconiosis and ensure prompt and efficient processing of those claims. These are undeniably legitimate governmental objectives. And Gardner and Martinez have not carried their burden of proving "that the facts on which the classification is apparently based could not reasonably be conceived to be true" by the legislature.[51]

## A. Consensus Procedure.

As demonstrated by the disparity in the parties' evidence in this case, "B" readers hired by the parties to provide medical opinions in coal-related pneumoconiosis claims often differ greatly concerning the presence or severity of the disease. The adoption of the consensus process and enactment of KRS 342.792 imply a conclusion by the 2002 General Assembly that opinions from a panel of three physicians who are also "B" readers, but who are hired by the commissioner, would be unbiased. For this reason, they would provide a more accurate and persuasive assessment of the worker's actual condition than the parties' experts. And the consensus of such a panel would be more persuasive than the opinion of a single university evaluator.

Legislative history reveals the 2002 General Assembly's concern with preventing "doctor shopping" and the need to obtain unbiased medical opinions. One Senator took the Senate floor to speak in support of the bill, stating the amendments ensure "the integrity of the process by focusing on obtaining the best and most unbiased x-ray assessment we can get from the 'B' reader consensus process." Coal industry representatives and union representatives[52] testified before the House's Labor and Industry committee concerning the need for independent medical evaluations and the desire to prevent a return to the "battle of the experts" situation that formerly dominated the administrative process. And this Court has recognized that "the apparent purpose of KRS 342.794(1) and the second level of the consensus procedure set forth in KRS 342.316(3)(b)4e is to provide the ALJ with additional evidence from three "B" readers who are unbiased."[53]

48. *Id.* (citations omitted).

49. *Commonwealth v. Howard*, 969 S.W.2d 700, 705 (Ky.1998).

50. I note that it is not necessary to prove that the legislature actually considered the legitimate reasons proposed for the rational basis test. It is enough that the Court can conceive of legitimate reasons. *See F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.") (citations omitted).

51. *Kimel*, 528 U.S. at 84, 120 S.Ct. 631 (citations omitted).

52. Specifically, the legislative committee heard from a representative of Union Coal Miners and the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO), a federation of 57 national and international labor unions. http://www.aflcio.org/aboutus/ (verified on November 30, 2011).

53. *Hunter Excavating v. Bartrum*, 168 S.W.3d 381, 385 (Ky.2005).

The consensus process also advances a legitimate state interest in the prompt and efficient processing of benefits applications. Claims based on coal-related pneumoconiosis account for approximately 44 percent of all occupational disease claims filed during the ten-year period from fiscal year 1999–2000 through 2009–2010 and approximately 42 percent in fiscal year 2000–2001, which immediately preceded the 2002 General Assembly.[54] Occupational disease applicants seeking benefits under KRS 342.370 must prove their disease produces a permanent impairment rating. Only some of those seeking benefits under KRS 342.732 must do so.[55] So use of the consensus process expedites the processing of coal-related pneumoconiosis claims by limiting university evaluations to those claims in which the worker has been found to suffer from the disease and alleges respiratory impairment.[56] It also saves employers the expense and saves workers the inconvenience of travel and of undergoing the evaluation unless the disease is found to be present.[57] In addition, KRS 342.316(3) limits the record in coal-related pneumoconiosis claims to evidence that is relevant to diagnosing the presence of the disease until such time as other evidence becomes relevant.

The majority asserts the consensus process and the clear and convincing evidentiary burden cannot "be justified as [ ] cost-saving measure[s], as it is axiomatic that, if the enhanced procedure saves money, the state would save more money by subjecting *all* occupational pneumoconiosis claimants to the more exacting procedure and higher rebuttable standard." It is a poor argument to say the consensus procedure is not rationally related to promoting unbiased medical diagnoses or prompt and efficient processing of coal-related pneumoconiosis claims simply because the procedure would also advance those goals if applied to all pneumoconiosis claims. The majority's analysis is flawed here for two reasons.

First, there is a heightened need for accuracy and efficiency for coal-related pneumoconiosis claims because of the sheer number of coal-related pneumoconiosis claims and the special benefits available to the claimants. KRS 342.732 provides different benefits for employees suffering from coal-related pneumoconiosis than employees suffering from other types of pneumoconiosis enjoy, some of which require no proof of a permanent impairment rating. KRS 342.732(1)(a) entitles those who suffer from category 1 coal workers' pneumoconiosis to a "retraining incentive

54. *See* 2009–2010 KENTUCKY DEPARTMENT OF WORKERS' CLAIMS ANN. REP. 11. The report indicates that 3,279 coal workers' pneumoconiosis claims and 4,245 other occupational disease claims (including claims for other occupational pneumoconioses) were filed during the previous ten-year period. The report does not specify the number of claims based on other occupational pneumoconioses, http://www.labor.ky.gov/workersclaims/Periodic%20Reports/Annual%20Report%202009–2010.pdf (verified December 5, 2011).

55. Employees seeking income benefits under KRS 342.732 must prove pulmonary dysfunction.

56. *Durham*, 272 S.W.3d at 196 (noting the present statutes "attempt to control the cost of coal workers' pneumoconiosis claims, particularly by workers with no significant respiratory impairment.").

57. The commissioner's July 1, 2003, report to the Interim Joint Committee on Labor and Industry indicates that "B" readers were paid *$100.00 per x-ray interpretation and that seven* Kentucky "B" readers were located in eastern Kentucky, one in Owensboro, and seven in Lexington or Louisville. For university evaluations, employees must travel to the University of Louisville or University of Kentucky medical schools.

benefit" (RIB) without requiring proof that the condition produces a permanent impairment rating. Other subsections of KRS 342.732(1) presume a particular level of disability based on the disease category and respiratory impairment. And KRS 342.732(*l*)(a)7 entitles workers who are at least 57 years old on the date of last exposure to elect to receive, in lieu of a RIB, up to 425 weeks of benefits based on a 25 percent disability rating without proving a permanent impairment rating due to pneumoconiosis.

In contrast, KRS 342.730(1) bases the entitlement to partial disability benefits for other forms of pneumoconiosis on the permanent impairment rating the condition produces, a corresponding statutory factor, and various multipliers. It bases a finding of permanent total disability on proof of a permanent impairment rating and a permanent and complete inability to work.[58] And it does not provide for retraining benefits. Because coal workers receive special benefits, the legislature rationally believed that a "more exacting procedure" and a "higher rebuttable standard" were necessary to ensure accuracy and efficiency.

Second, the legislature need not tackle all problems in the workers' compensation system at once. It is unprecedented and unfair for this Court to quibble that because the consensus procedure and the clear and convincing standard for rebuttal would be equally effective in promoting efficiency and accuracy across the board, the legislature must use the procedure for all pneumoconiosis claims or not at all.

The Equal Protection Clause allows the State to regulate one step at a time, addressing itself to the phase of the problem which seems most acute. The State need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.[59]

The 2002 General Assembly impliedly viewed the problems with coal-related pneumoconiosis claims as the Commonwealth's most pressing occupational disease issue at that time. This can be logically attributed to the fact that nearly half (42 percent) of all occupational disease claims filed in fiscal year 2000–2001 were based on coal-related pneumoconiosis.[60] "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' "[61] It is enough that the consensus procedure is rationally related to the legitimate government objectives of accurate, prompt, and efficient processing of coal-related pneumoconiosis claims.

**B. The Clear and Convincing Standard for Rebuttal.**

Contrary to the majority opinion, less than three years ago a majority of this Court held in *Durham v. Peabody Coal Co.*[62] that KRS 342.316(13) may appear to be discriminatory but does not actually impose a greater burden of proof on coal

---

**58.** *See Ira A. Watson Department Store v. Hamilton*, 34 S.W.3d 48 (2000).

**59.** *Clements v. Fashing*, 457 U.S. 957, 969–70, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (internal quotations and citations omitted).

**60.** *See* 2009–2010 Kentucky Department Of Workers' Claims Ann. Rep. 11.

**61.** *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (citations omitted).

**62.** 272 S.W.3d 192, 196 (Ky.2008).

workers who claim benefits under KRS 342.732. Quoting from *Fitch v. Burns*,[63] we explained in *Durham* that "the concept of clear and convincing evidence 'relates more than anything else to an attitude or approach to weighing the evidence' and refers to 'evidence substantially more persuasive than a preponderance of the evidence, but not beyond a reasonable doubt.'"[64]

All workers seeking benefits under Chapter 342 bear the burden of proof and risk of non-persuasion.[65] To meet that burden, a worker must go forward with substantial evidence of every element of the claim, *i.e.*, evidence sufficient to convince reasonable people.[66] When met with equally convincing evidence, the worker must offer more persuasive evidence in rebuttal or lose the claim. We concluded in *Durham* that KRS 342.316(13)'s use of the term "clear and convincing evidence" acknowledges that reality and "imposes no greater burden than is placed on any other worker whose evidence is met with very persuasive contrary evidence."[67] Despite the majority's attempt to distinguish *Durham*, the majority opinion today unquestionably overrules this recent opinion of the Court.[68]

Even viewing the clear and convincing rebuttal standard as more burdensome, it is rationally related to the legitimate government interest in accurate findings of coal-related pneumoconiosis. Like KRS 342.315(2), applicable to non-coal-related pneumoconiosis claims, KRS 342.316(13) creates a rebuttable presumption that the opinions of certain highly-skilled and unbiased medical experts are accurate concerning the existence and severity of an occupational disease. Unlike KRS 345.315(2), KRS 342.316(13) bases the presumption on the fact that a consensus panel consists of three physicians who are "B" readers, licensed in Kentucky, and hired by the commissioner and the fact that at least two panel members reach a consensus.[69] The claimant must offer clear and convincing evidence to overcome this presumption.

The legislature could have rationally believed the consensus of such experts would provide an accurate and unbiased assessment of the worker's condition that would assist the ALJ in weighing the conflicting evidence. And it is reasonable to presume that a consensus x-ray interpretation reflects the worker's condition accurately and is probably more accurate than a conflicting interpretation performed by a "B" reader hired by a party. In other words, a panel consensus is highly persuasive evidence that may only be rebutted by even more persuasive evidence.

---

**63.** 782 S.W.2d 618, 622 (Ky.1989).

**64.** *Durham*, 272 S.W.3d at 196–97.

**65.** *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735 (Ky.App.1984); *Snawder v. Stice*, 576 S.W.2d 276 (Ky.App.1979); *Young v. Burgett*, 483 S.W.2d 450 (Ky.1972); *Roark v. Alva Coal Corp.*, 371 S.W.2d 856 (Ky.1963).

**66.** *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky.1986); *See also Smyzer v. B.F. Goodrich Chemical Co.*, 474 S.W.2d 367 (Ky.1971).

**67.** *Durham*, 272 S.W.3d at 196–97.

**68.** The majority attempts to distinguish the case, citing the fact that coal workers in *Dur-* *ham* challenged the disparate treatment between coal-related pneumoconiosis claims and workers' compensation claims for traumatic injuries; not the classification between coal and non-coal pneumoconiosis claims. But this difference does not affect the holding in *Durham* that KRS 342.315(13) "imposes no greater burden than on any other worker whose evidence is met with very persuasive contrary evidence." *Id.* at 197.

**69.** When there is no consensus, KRS 342.316(3)(b)4e directs the ALJ to decide the claim based on the evidence submitted.

In light of the consensus panel of "B" readers, which provides more accurate, unbiased, and persuasive medical diagnoses, and our recent holding in *Durham*, it is rational to require claimants to produce clear and convincing evidence to overcome the expert panel's consensus.

## II. EQUAL PROTECTION ANALYSIS DOES NOT REQUIRE A SCIENTIFIC DISTINCTION BETWEEN COAL–RELATED PNEUMOCONIOSIS AND OTHER FORMS OF THE DISEASE.

The majority bases its opinion largely on the fact that coal-related pneumoconiosis is scientifically identical to pneumoconiosis from other dust sources. In stating that "there is no 'natural' or 'real' distinction between coal workers' pneumoconiosis and other forms of pneumoconiosis," the majority employs the wrong constitutional test and relies on the *dissenting* opinion in *Kentucky Harlan Coal Co. v. Holmes*.[70] Whether a natural or real distinction exists to support a classification determines whether a statute is 'special legislation' in violation of Section 59 of the Kentucky Constitution, not whether it violates Equal Protection guarantees.

In *Holmes,* a coal company challenged the constitutionality of a statute in effect before the 1996 overhaul of workers' compensation, providing income benefits for coal-related pneumoconiosis based on x-ray evidence and creating an irrebuttable presumption that a claimant is totally disabled based on x-ray classifications.[71] The coal company claimed the statute was 'special legislation' because it favored coal workers. "[I]n order for a law to be general [rather than 'special'] in its constitu-

tional sense it must meet the following requirements: (1) it must apply equally to all in a class, and (2) there must be *distinctive* and *natural* reasons inducing and supporting the classification."[72] While the majority here cites the dissenting opinion in *Holmes* to refer to 'natural' distinctions in a scientific sense, the majority of the court in *Holmes* made clear that "the classification ... must be based upon some reasonable and substantial difference in *kind, situation or circumstance* which bears a proper relation to the purpose of the statute."[73]

And contrary to the majority's current finding, the *Holmes* court held that "distinctive and natural reasons [exist] for classifying [coal workers who have contracted pneumoconiosis] from workers in other industries who have also contracted pneumoconiosis."[74] The Court found that the 1987 statute was part of a comprehensive overhaul of the Kentucky Workers' Compensation Act in response to the burden of coal-related workers' compensation claims on the Special Fund.[75] The legislature responded to the concern, in part, by "incorporating medical realities into both the standards for the admissibility of evidence for claims involving coal workers' pneumoconiosis (KRS 342.316), [and] the standards of proof for the various levels of benefits set forth in the newly-enacted KRS 342.732."[76] Despite the fact that no scientific difference exists between coal-related pneumoconiosis and other forms of the disease, the Court held that the claims could be treated differently because of the sheer number of coal-related pneumoconio-

---

70. 872 S.W.2d 446 (Ky.1994).

71. *Id.*

72. *Id.* at 452 (emphasis added).

73. *Id.* (emphasis added).

74. *Id.* at 453.

75. *Id.* at 452.

76. *Id.* at 453.

sis claims and their economic impact on the Special Fund.[77]

Similar reasons uphold the current workers' compensation scheme against the Equal Protection claims here. The sheer number of coal-related pneumoconiosis claims necessitates an efficient and prompt processing method. And the mere fact that "pneumoconiosis is pneumoconiosis is pneumoconiosis" does not prohibit the legislature from tailoring its actions to address the differing needs of the Commonwealth's claimants, industries, and the workers' compensation structure itself. By holding otherwise, the majority overrules yet another decision of this Court.

## III. THE LEGISLATURE CAN REQUIRE THE CONSENSUS PROCESS AND THE CLEAR AND CONVINCING REBUTTAL STANDARD BECAUSE COAL WORKERS RECEIVE SPECIAL BENEFITS.

The legislature can require the consensus procedure and the clear and convincing rebuttal standard for coal-related pneumoconiosis claims because coal workers receive special benefits. As discussed above, coal workers with pneumoconiosis receive special retraining benefits without proving permanent impairment. In contrast, employees with other forms of pneumoconiosis may not receive retraining benefits and must prove impairment to receive income benefits.

The *Holmes* court addressed a similar argument from the coal company that a presumption of occupational disability unconstitutionally benefited coal workers, unlike employees in other industries. The court found,

> The mere fact that the legislative treatment of coal workers' pneumoconiosis is different from that of other occupational pneumoconioses does not make it arbitrary or unfair to either group. Workers with coal workers' pneumoconiosis are entitled to a presumption of occupational disability based on the medical criteria of the various subsections of KRS 342.732, *but their standards for admissible medical evidence are more stringent and they are required to meet a minimum exposure requirement before they may receive benefits ....* Workers with other occupational pneumoconioses are not subject to the stringent medical proof requirements or minimum exposure requirements, but are required to prove the degree to which their disease has caused them to be occupationally disabled.[78]

Likewise, the differing statutory treatment of coal-related pneumoconiosis claims and other pneumoconiosis claims does not render the statutes arbitrary or unfair, or deny coal workers Equal Protection. Because coal workers with pneumoconiosis receive special retraining benefits without proving permanent impairment, the legislature is entitled to require different medical procedures and more stringent standards of proof. When the benefits, for a class of workers differ from other classes, the burdens may also differ. The majority's contrary reasoning again overrules our holding in *Holmes.*

Other courts have also found that entitlement to special benefits defeats Equal Protection claims. The Federal Circuit Court of Appeals held that because one group received special benefits they were not similarly situated to other groups, rendering the Equal Protection guarantee inapplicable.[79]

---

77. *Id.*

78. *Id.* (emphasis added).

79. *Absher v. United States,* 805 F.2d 1025, 1026–27 (Fed.Cir.Ct.App.1986) ("The Claims Court, of course, took the position that '[t]he

And this Court has held that a statute "may be upheld over an [E]qual [P]rotection argument when a party is caused to bear a different economic burden or enjoys a different economic benefit." [80] Similarly, coal workers may be required to undergo the consensus procedure and present clear and convincing rebuttal evidence because they receive special retraining benefits.

## IV. THE 2002 AMENDMENTS TO CHAPTER 342 WERE NOT ENACTED OUT OF A DESIRE TO HARM A POLITICALLY UNPOPULAR GROUP.

The majority erroneously supports its decision with *City of Cleburne, Texas v. Cleburne Living Center.* [81] *Cleburne* dealt with a state requirement that homes for the mentally disabled obtain a special use permit. [82] The federal Court of Appeals for the Fifth Circuit decided the mentally handicapped constitute a quasi-suspect class requiring intermediate scrutiny under the Equal Protection Clause. [83] The Supreme Court disagreed, finding that the rational basis test applied. But the Supreme Court held that the government did not achieve a legitimate interest by requiring homes for the mentally disabled to apply for a special permit. [84] Rather, the requirement was based largely on the fears and biases of the community. [85] The

Court stated, "some objectives—such as a bare [ ] desire to harm a politically unpopular group[ ]—are not legitimate state interests." [86]

*Cleburne* spurred a debate about whether a more stringent rational basis review applied to classifications of politically unpopular groups. [87] Justice O'Connor stated in a later concurring opinion that "[w]hen a law exhibits such a desire to harm a politically unpopular group, *we have applied a more searching form of rational basis review* to strike down such laws under the Equal Protection Clause." [88] Even if *Cleburne* is read as using the traditional rational basis test, the City of Cleburne could not name a single legitimate reason to require homes for the mentally handicapped to apply for a special use permit when other types of homes did not have to do so. Rather, the legislation was based in the fears and biases of the community.

In sharp contrast, Kentucky coal workers have enjoyed enormous political support in the General Assembly. It is clear from legislative history that the 2002 General Assembly intended the amendments to Chapter 342 to benefit coal miners rather than harm them. The legislators who spoke on the subject during the 2002 session maintained that the 1996 overhaul of

special benefits accorded retirees of the uniformed services are such that this class of individuals is not situated similarly to other groups that are not required to waive retirement pay to receive tax-free VA benefits.' .... We do not therefore discern error in the legal conclusion of the Claims Court.'").

**80.** *Stephens v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 624, 627 (Ky.1995).

**81.** 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

**82.** *Id.* at 436, 105 S.Ct. 3249.

**83.** *Id.* at 437–38, 105 S.Ct. 3249. The intermediate scrutiny test requires that govern-

ment action is substantially, related to an important government interest.

**84.** *Id.* at 450, 105 S.Ct. 3249.

**85.** *Id.*

**86.** *Id.* at 446–47, 105 S.Ct. 3249 (internal quotations and citations omitted).

**87.** *See Powers v. Harris*, 379 F.3d 1208 (10th Cir.2004) (discussing whether *Cleburne* changed the rational basis test).

**88.** *Lawrence v. Texas*, 539 U.S. 558, 580, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (concurring in part) (emphasis added).

the workers' compensation scheme unintentionally restricted the number of successful coal-related pneumoconiosis claims. These new amendments were meant to liberalize the process and allow coal miners who actually suffered from pneumoconiosis to receive benefits more efficiently. So the legislature decided to provide retraining benefits without making coal miners prove permanent impairment. Along with these special benefits came the need to ensure more accurate and affordable medical diagnoses, which the legislature sought to achieve by requiring the consensus procedure and the clear and convincing burden of proof.

## V. THE COURT MUST NOT INVADE THE PROVINCE OF THE LEGISLATURE.

The majority erroneously "reject[s] any contention that the two-step procedure promotes prompt and efficient processing of coal mining pneumoconiosis cases, as an additional step presents nothing more than another formidable hurdle for the' coal worker before he or she can receive compensation." Whether or not the 2002 amendments achieved the legislature's objectives is not for the courts to decide. Arguably, the consensus procedure and the clear and convincing evidentiary burden have made it more difficult, or as difficult, for coal workers to prove they suffer from pneumoconiosis than before the 2002 amendments. But this does not authorize the judicial branch to usurp the

policy-making role of the elected legislators under the guise of Equal Protection analysis. "[I]t is up to legislatures, not courts, to decide on the wisdom and utility of legislation."[89] And "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."[90] Because the legislature could have rationally believed the consensus procedure would ensure prompt and efficient processing of coal-related pneumoconiosis claims, the Equal Protection challenge must fail.

For similar reasons, I cannot agree with Justice Schroder's opinion concurring, in part, and dissenting, in part. The legislature is constitutionally permitted to require a different procedure and standard of proof for coal-related pneumoconiosis claims. A requirement from this Court that coal workers be allowed to pursue both statutory paths to workers' compensation benefits is a policy choice that impinges upon the legislative prerogative. And rather than providing Equal Protection under the law, allowing both statutory paths to coal workers would give coal workers greater than Equal Protection under the law.[91]

## VI. CONCLUSION.

The majority's opinion runs contrary to well-established precedent and overturns this Court's recent decisions in *Durham* and *Holmes.* Because the legislature could have rationally believed the consen-

---

89. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 469, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (quotations and citations omitted).

90. *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249.

91. *See Desris v. City of Kenosha, Wis.,* 687 F.2d 1117, 1120 (7th Cir.1982) ("Simply stated, the plaintiffs claim that they are entitled,

to retire at the same age as s 62.13 pensioners but at the higher WRF benefit level. The plaintiffs' claim of entitlement to one beneficial portion or aspect of the s 62.13 pension plan is not a claim for [E]qual [P]rotection of the law but rather more properly should be designated as a claim for greater protection under the law.").

sus procedure and the clear and convincing evidentiary burden would ensure unbiased, prompt, and efficient processing of coal-related pneumoconiosis claims, I would find that KRS 342.316(3) and (13) do not violate the federal or state Equal Protection guarantee. Therefore, I must respectfully dissent.

ABRAMSON, J., joins.